SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-13-909

| | |
|---|---|
| LECIA ANN TEMPLETON<br>APPELLANT<br><br>V.<br><br>DOLLAR GENERAL STORE,<br>DOLLAR GENERAL CORP., and<br>DEATH AND PERMANENT TOTAL<br>DISABILITY TRUST FUND<br>APPELLEES | **Opinion Delivered** April 23, 2014<br><br>APPEAL FROM THE ARKANSAS<br>WORKERS' COMPENSATION<br>COMMISSION [NO. G006798]<br><br><br><br>AFFIRMED |

## DAVID M. GLOVER, Judge

Lecia Templeton sustained a compensable back injury on July 12, 2010, while working for Dollar General; reached the end of her healing period on September 27, 2011; and was awarded a fifteen-percent anatomical impairment rating in connection with that injury. She subsequently sought wage-loss disability in addition to her anatomical loss. The Arkansas Death and Permanent Total Disability Trust Fund deferred to the outcome of the litigation. Following a hearing, the ALJ denied her claim. The Arkansas Workers' Compensation Commission affirmed and adopted the ALJ's decision, and this appeal followed.

Templeton raises two points of appeal: 1) the Commission's conclusion that the modified employment offered by Dollar General constituted a bona fide offer of employment is not supported by substantial evidence, and 2) she proved by a preponderance of the credible evidence that she is permanently and totally disabled as a result of her admittedly compensable



injuries; alternatively, she proved by a preponderance of the credible evidence that she is entitled to wage-loss disability. We affirm.

*Hearing Before ALJ*

At the hearing before the ALJ, substantial testimony was given, primarily by Templeton. She testified that she worked for Dollar General a total of four years; she was hired as a cashier and later promoted to a management position called a third key. She explained her job duties as third key included stocking merchandise, overseeing employees, and doing paper work. According to her, the paperwork took approximately one hour out of her eight- to nine-hour work day. She testified she was fifty-one years old; she graduated from high school but had no other special training or education; and she had worked in retail for the past thirty years, which was the only type of work she had ever done.

Templeton explained that she had three back surgeries. She testified as follows. She underwent the third surgery because her back was getting worse and the pain had increased to the point she could not handle it; her leg stayed swollen much of the time; and she lost strength in her lower back and could not walk, sit, or stand for long periods of time. When her leg "went out," she would fall if she did not have something to lean on. Her third surgery provided relief, but she continued to have symptoms. Her right leg sometimes involuntarily drew up, curling from the toe to the hip and staying that way for ten to fifteen minutes and she could not do anything until it stops. Dr. Ricca released her with a fifteen-percent-impairment rating, which Dollar General accepted and paid weekly. Dr. Ricca's restrictions for her were that she be allowed to sit, stand, and lie down as needed.

2

Templeton offered this further testimony. She was currently able to lift five to seven pounds; she can lift a carton of milk but feels a strain in her back when she does; the heaviest item she has lifted since her injury was ten pounds; she can lift a trash bag full of trash; she can bend some but not completely; she can sit for fifteen to twenty-five minutes without standing up and, if she sits longer, her right leg starts to go numb and she gets a pinching, burning pain in her back; standing stretches her leg and back and relieves some of the discomfort; and she can stand for fifteen to twenty-five minutes but if she stands for too long, her right leg goes out; and she has fallen twice but tripped more often.

She testified that she has a brace to keep her toes up; can walk approximately a block to a block and a half; walking further causes her back and leg to go out; she does not sleep well at night because she has cramping and drawing in her back and leg; a good day for her is when her pain level is at four; on good days, she will wash some dishes and do some dusting; on a bad day, her pain level is at seven or eight and she does not engage in any activities; four out of seven days are bad; she can no longer do yard work and gardening, which she used to enjoy; she can no longer ride horses; she feeds and brushes her two horses at times but nothing else; she can sit on the ground and pick vegetables; she can no longer go shopping with her seventeen-year-old daughter; and she can no longer coach softball.

As Templeton explained, when she attempted to return to work after the third surgery, with the same restrictions as before, she stocked shelves and was given an office chair with no arms to sit in and stock inventory from a shopping cart; the cart items were level with her knees or chest when she was sitting in the chair; to take an item out and put in on the shelf,

she would have to turn and twist around and either bend down or reach up (even though her doctor restricted her from twisting and bending); the repeated twisting and bending caused her discomfort; getting up and down to move the chair and cart caused pain in her leg; the shelves were six-and-one-half feet tall, and she was asked to stock the top shelves but she could not because of the reaching and stretching involved; and no employee was assigned to help her with the cart, but she received help when she asked for it.

It was Templeton's additional testimony that Dollar General discussed with her the possibility of working as a cashier, but she said that some of the items she would have been required to scan weighed more than ten pounds and she would have to twist and bend frequently. She said she would have had to stretch to reach the register keys while sitting. She testified that normally only two employees were on duty during any given shift, but that when she returned to work after her third surgery, Dollar General brought in a third employee because she was not able to perform the duties an employee would be required to perform—"essentially paying a third employee just to accommodate having me there."

Templeton testified that part of her work restrictions was that she be allowed to lie down when necessary. She said Dollar General did not allow her to lie down in the store (there were discussions about providing her a place to lie down on a cot near the cashier, but it was a very public area and it was never done); lying down in her truck was embarrassing; and she would usually lie down every two to three hours. She said she was scheduled to work four to six hours a day, but sometimes she could not work a full day because of her back

4



troubles.  Also, she stated that some of the store managers were irritated by the fact that her work was restricted.

She explained she ultimately resigned her employment because she felt she had done all she could physically; she had lost function in her right leg; she felt belittled; she thought if she kept working, it would result in additional surgeries; however, she feels her back is stronger since quitting because she is no longer forced to twist and bend; her condition got worse between her third surgery and when she resigned; and she is not aware of any job at Dollar General she thinks she would be able to do.

On cross-examination, Templeton acknowledged her work experience:  she had owned a business from 1989 to 2003 that sold candles and decorative household items; to conduct that business, she had learned how to sell things on eBay; she did some bookkeeping for her husband's construction business from 1982 until 1999, when her husband went on social-security disability; and she also previously worked as a manager for Walmart, supervising twenty employees.

She confirmed that her last surgery was in April 2011 and that it made her back stable and helped with the pain.  She acknowledged that Dollar General allowed her to lie down in her truck as needed and that Dollar General brought in an additional employee to do the work she was unable to do on her shift.  She also acknowledged that she had stated in her deposition the work she was doing when she left Dollar General was within her restrictions, Dollar General continued to provide sedentary duty for her, and that if she had not resigned

she would still be working there. She stated that she currently receives a monthly award from Social Security Disability, has no intention of going to work, and has applied for no jobs.

Templeton acknowledged that in August 2009, she went to her family doctor and complained of back pain caused by muscle strain; she was prescribed Lorcet at that time; she was then working for Walmart; she had the prescription refilled in October 2009; her records noted chronic lumbar pain through 2009; in 2010, she complained of anxiety due to chronic pain; she again noted chronic lumbar pain in February 2010; and she resigned from Dollar General on December 10, 2011.

On redirect, Templeton explained that prior to July 12, 2010, she did not have any physical problems that affected her ability to work; she did not miss any time from work because of previous back problems; she would no longer be able to run the sort of business she had had because there was a lot of heavy lifting involved; her husband has back and neck problems; she could not perform bookkeeping duties because the medicine she takes makes her feel "spaced out" and unfocused; her Walmart job was not sedentary; and Dollar General never provided her any guarantee that they would continue to provide sedentary work for her.

Michael Templeton, Lecia's husband, testified on her behalf. He has observed a tremendous difference in her physical function since her injury; she gets up during the night because of her pain and leg twitches; she moans and groans all night; there are things she is unable to do now; there has been a loss of consortium; her mind seems weak and tired; and her problems seem to affect her emotionally and psychologically, as well as physically.

6

 

Tracy Voigt, Dollar General district-sales manager, testified by telephonic deposition. Her testimony basically consisted of explaining what Dollar General did to accommodate Lecia's work restrictions.

The ALJ noted that Dr. Ricca referred Templeton for a functional-capacity evaluation, which determined that she had significant functional limitations but that, overall, she was able to perform sedentary work as defined by Department of Labor guidelines.

*Standard of Review*

In reviewing a decision of the Workers' Compensation Commission, we view the evidence and all reasonable inferences in the light most favorable to the Commission's findings, and the decision will be affirmed if it is supported by substantial evidence. *Dismute v. Potlatch Corp.*, 2014 Ark. App. 176. Substantial evidence exists if reasonable minds could reach the Commission's conclusion. *Id.* When a claim is denied due to the claimant's failure to prove entitlement to compensation by a preponderance of the evidence, the substantial-evidence standard of review requires this court to affirm if the Commission's opinion displays a substantial basis for the denial of relief. *Id.* Where there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Id.* Questions of weight and credibility are within the sole province of the Commission, which is not required to believe the testimony of the claimant or of any other witness but may accept and translate into findings of fact only those portions of the testimony it deems worthy of belief. *Sykes v. King Ready Mix, Inc.*, 2011 Ark. App. 271. We will not reverse the Commission's decision unless we are convinced that fair-minded persons with the



same facts before them could not have reached the conclusions arrived at by the Commission. *Id.*

*Discussion*

For her first point of appeal, Templeton contends that the Commission's finding that the modified employment offered by Dollar General was a bona fide offer is not supported by substantial evidence. For her second point of appeal, she challenges the Commission's decision, contending alternatively that she had proved she was either permanently and totally disabled or that she was entitled to wage-loss disability benefits. These issues are intertwined and can best be discussed together.

Permanent and total disability means the inability, because of compensable injury or occupational disease, to earn any meaningful wages in the same or other employment. *Gibson v. Walmart Assoc., Inc.*, 2012 Ark. App. 560; Ark. Code Ann. § 11-9-519 (Repl. 2012). When a claimant has been assigned an anatomical-impairment rating to the body as a whole, the Commission has the authority to increase the disability rating, and it can find a claimant totally and permanently disabled based upon wage-loss factors. *Gibson*, *supra*. The wage-loss factor is the extent to which a compensable injury has affected the claimant's ability to earn a livelihood. *Id.* The Commission is charged with the duty of determining disability based upon a consideration of medical evidence and other matters affecting wage loss, including the claimant's age, education, and work experience. *Id.* The claimant carries the burden of proving an inability to earn any meaningful wages in the same or other employment. *Id.* The claimant's motivation to return to work, or lack thereof, is a factor that can be considered

when determining an employee's future earning capacity. *Meadows v. Tyson Foods, Inc.*, 2013 Ark. App. 182.

Arkansas Code Annotated section 11-9-522 (Repl. 2012) provides in pertinent part:

> (b)(1) In considering claims for permanent partial disability benefits in excess of the employee's percentage of permanent physical impairment, the Workers' Compensation Commission may take into account, in addition to the percentage of permanent physical impairment, such factors as the employee's age, education, work experience, and other matters reasonably expected to affect his or her future earning capacity.
>
> (2) However, so long as an employee, subsequent to his or her injury, has returned to work, has obtained other employment, or has a bona fide and reasonably obtainable offer to be employed at wages equal to or greater than his or her average weekly wage at the time of the accident, he or she shall not be entitled to permanent partial disability benefits in excess of the percentage of permanent physical impairment established by a preponderance of the medical testimony and evidence.

Arkansas Code Annotated section 11-9-526 (Repl. 2012) further provides:

> If any injured employee refuses employment suitable to his or her capacity offered to or procured for him or her, he or she shall not be entitled to any compensation during the continuance of the refusal, unless in the opinion of the Workers' Compensation Commission, the refusal is justifiable.

The ALJ's major conclusion, affirmed and adopted by the Commission, was that the "claimant has failed to prove, by a preponderance of the credible evidence, that she is entitled to any wage-loss disability in excess of the fifteen percent (15%) whole body impairment which respondents have accepted and were in the process of paying." In discussing the wage-loss issue generally, the ALJ commented, "Although there may exist a factual dispute concerning whether or not the claimant refused suitable employment offered to her by the employer pursuant to Ark. Code Ann. § 11-9-526, in my opinion, a preponderance of the evidence reflects that the claimant voluntarily terminated her employment and elected not to

return to the job market and is, therefore, not entitled to wage-loss disability." Later in his discussion, the ALJ acknowledged that he found the accommodations made by the employer to be extremely unusual and "that the claimant may have even felt humiliated by her immediate manager's actions, [but] it is undisputed that the claimant ultimately voluntarily resigned her job with the employer herein." The ALJ further noted that at the time she voluntarily quit, she was earning wages equal to those she earned at the time of her injury. He concluded that she was still capable of obtaining other employment at minimum or entry-level wages, which was the level of wages she earned at the time of her injury. He found her to be credible and candid in conceding that she was not interested in pursuing employment, but that her lack of motivation in pursuing employment was a clear impediment to assessing her wage-loss disability. He concluded that she had failed to establish that she was entitled to wage-loss disability.

Templeton acknowledged before the ALJ that she had stated in her deposition that the work she was doing when she left Dollar General was within her restrictions; that Dollar General would have continued to provide sedentary duties to her; that if she had not quit, she would still be working there; that they allowed her to go to her truck and lie down as needed; and that they had an additional employee on her shift to perform the work Templeton could not. She also acknowledged she had no intention of looking for employment.

In short, Templeton was only fifty-one years old; she had extensive experience in retail sales; and she also had experience in bookkeeping and in running her own business. All of her work experience could be categorized as rather sedentary. The functional-capacity

evaluation concluded that despite her significant limitations, she was still capable of performing sedentary tasks. Further, she readily acknowledged a total lack of motivation to obtain employment. Reasonable minds could reach the same conclusion reached by the Commission that Templeton failed to prove she was entitled to any wage-loss disability in excess of the fifteen-percent whole body impairment already awarded. We therefore hold that the Commission demonstrated a substantial basis for its denial of Templeton's claim for wage-loss disability and affirm its decision.

Affirmed.

GLADWIN, C.J., and HIXSON, J., agree.

*C. Michael White*, for appellant.

*Worley, Wood & Parrish, P.A.*, by: *Melissa Wood*, for appellees.